

U.S. Department of Justice

United States Attorney
District of Maryland

Sandra Wilkinson
Chief, Major Crimes
Sandra.Wilkinson@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4921
MAIN: 410-209-4800
FAX: 410-962-0716

October 21, 2015

Teresa Whalen, Esq.
801 Wayne Ave., Ste. 400
Silver Spring, MD 20910

Re: United States v. Taylor Pepe, GLR 15-020

Dear Ms. Whalen:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by your client by close of business on October 23, 2015 and by the Court by the close of business on October 26, 2015 it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Count One and Three of the Second Superseding Indictment now pending against him, which charges him respectively with Conspiracy to Interfere with Commerce through Robbery, in violation of 18 U.S.C. § 1951 and the lesser included offense of Aiding and Abetting the Brandishing, Use and Carry of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c). The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

**Count One: Conspiracy to Interfere with Commerce by Robbery**

    a. On or about the date charged in the Second Superseding Indictment, the defendant knowingly conspired with others to obtain property from another without that person's consent;

    b. The taking was by wrongful use of actual or threatened force, violence, or fear.

1

c. Interstate commerce, or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in any way or degree as a result of the conspiracy to rob.

**Count Three: Aiding and Abetting the Brandish and Use of a Firearm during a Crime of Violence**

a. The defendant committed the elements of conspiring to interfere with commerce by robbery as charged in Count One of the Second Superseding Indictment;

b. The defendant knowingly aided and abetted the possession, use, carry and brandishing of the firearm; and

c. The possession and brandishing was in furtherance of, and the use, carry and brandishing was during and in relation to, the crime of violence charged in *Count One of the Superseding Indictment*.

Penalties

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: for Count One: twenty years imprisonment, three years of supervised release and a fine of $250,000; Count Three: life imprisonment, a mandatory minimum term of imprisonment of seven (7) years, five years supervised release and a fine of $250,000. In addition, the Defendant must pay $200.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

Waiver of Rights

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a) If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

b) If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c) If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d) The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e) If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f) By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g) If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h) By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences is the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5. The Defendant understands that the Court will determine a sentencing guidelines

3

range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

   a) Count One (Conspiracy to Interfere with Commerce by Robbery)

   **Government's Version:** The charged offense is conspiracy to commit robbery, but there is a cross-reference to the murder guidelines because a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial and maritime jurisdiction of the United States. U.S.S.G. § 2B3.1(c). Section 1111 of Title 18 defines Murder as "the unlawful killing of a human being with malice aforethought." Every murder "committed in the perpetration of, or attempt to perpetrate, any.... robbery" is murder in the first degree. Thus, the starting offense level is Level 43. U.S.S.G. §2A1.1. There is a 2 level increase because the Defendant was the organizer/leader of the robbery. Thus, the adjusted offense level would be 45 prior to acceptance of responsibility.

   **Defendant's Version:** The Defendant will argue that the Base Offense Level is 20 (Robbery). U.S.S.G. § 2B3.1(a). The victim of the robbery sustained permanent or life-threatening bodily injury resulting in a further increase of 6 levels. Thus, the adjusted offense level would be 26 prior to acceptance of responsibility.

   b) This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the plea is accepted as set forth in the introductory Paragraph on Page 1 above, this Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

   Thus the adjusted offense level for Count One is either 42 (Government's view) or 23 (Defendant's view).

c) Count Three: There is a mandatory minimum term of imprisonment of seven (7) years to be imposed consecutively to the sentence imposed on Count One.

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Obligations of the United States Attorney's Office

9. Both parties reserve the right to seek any lawful sentence using the factors set forth in 18 U.S.C. § 3553(a). Further, this Office will recommend a sentence of no more than 40 (forty) years of incarceration. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the count of the Second Superseding Indictment that this Office has agreed to dismiss at sentencing.

## Restitution

11. The offense of conviction is a crime of violence and thus the victim is entitled to mandatory restitution. The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

12. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

13. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the

5

Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

14. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. §1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

15. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

    b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal the determination of the defendant's criminal history, the weighing of the sentencing factors under 18 U.S.C. § 3553(e), and the decision whether to impose a fine, order of forfeiture, order of restitution, and term or condition of supervised release. The Defendant and this Office reserves the right to appeal the Court's findings with regard to the two contested applicable sentencing guidelines as set forth in Paragraph 6(a) above.

    c) Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

    d) The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

    e) The Defendant further waives any and all motions, defenses, probable cause determinations, objections which defendant could assert to the Second Superseding Indictment or to the Court's entry of judgment against the Defendant, and any imposition of sentence upon the Defendant consistent with this agreement. ~~If Defendant files a notice of appeal, notwithstanding this agreement, Defendant agrees that this case shall be remanded to the district court to determine whether Defendant is in breach of this agreement and, if so, to permit the United States to withdraw from the plea agreement.~~

### Obstruction or Other Violations of Law

16. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who

6

prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

17. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

18. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney

Lauren E. Perry
Special Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

10/23/15
Date

_____
Taylor King Pepe

I am Mr. Pepe's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

10/23/15
Date

_____
Teresa Whalen, Esq.

8

Exhibit A – US v. Pepe

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Taylor Pepe, age 21, was a resident of Laurel, MD, Howard County.

On January 23, 2014 at approximately 9:57 pm, Howard County Police Department ("HCPD") officers were dispatched to a single vehicle collision in Laurel, Maryland. A car had run into a tree. Upon arrival, HCPD officers observed bullet holes in the driver's side window. The driver, Russell Rowe, had been shot in the head multiple times. Witnesses reported seeing a male (later identified as Desmick Lewis) and a female (later identified as Amanda McAdoo) standing outside the immediate area of where the collision had occurred before the two fled. McAdoo has pleaded guilty in Howard County Circuit Court for her role in the crime.

HCPD officers recovered four Oxycodone pills in a clear plastic baggie and the victim's cell telephone inside the car. Investigators recovered numerous text messages leading up to the time of the shooting between McAdoo's phone & Rowe's phone which reflected an arranged meeting to purchase the 4 Oxycodone pills from Rowe for $30 each. The text messages also referenced a female named "Lauren" being with McAdoo. "Lauren" was later identified as Lauren Maready, an 18 year old Howard County resident, who has pleaded guilty in Howard County Circuit Court for her role in the crime. The last texts between McAdoo and Rowe occurred at or about 9:42 pm and noted that McAdoo would be arriving in a Black Mercedes. Maready's parents owned a Black Mercedes that Maready would drive.

Investigation revealed that on January 23, 2014, Maready and McAdoo went to Pepe's house. Pepe lived with his mother on Sand Cherry Lane in Laurel, Maryland. The three (Maready, McAdoo and Pepe) went to a local Chipotle's for lunch. The three discussed getting pills and McAdoo told Pepe that she knew that Rowe had pills to sell. Pepe told McAdoo to text whatever she needed to in order to get the pills.

At 4:11 p.m., a text message was sent from McAdoo's phone to Rowe, stating, "Do you have any pain pills?" At times, Pepe himself was using McAdoo's phone to communicate with Rowe, acting as if he were McAdoo. Witnesses would testify that, at some point in the afternoon, Pepe called Desmick Lewis. Phone records reflect three calls between Pepe and Lewis at or about 2:51 p.m., 3:13 p.m., and 3:32 p.m. Lewis and Pepe were frequently together.

During the early evening hours the same day, Maready, McAdoo and Pepe bought some marijuana from a male friend ("the seller") living in the Fulton, Maryland area. The four friends smoked the marijuana and they dropped the seller off and went back to Pepe's home. Phone records reflect a call from Lewis to Pepe at 7:25 pm. Maready, McAdoo, and Pepe went to pick up Lewis around 8 pm. They all talked about a plan to rob Rowe for the pills rather than purchase the pills. Witnesses would testify that Pepe said to Lewis, in sum or substance, "Show daddy what you can do and make me proud" and that Pepe was referring to the plan to rob Rowe.

After picking Lewis up, the four conspirators went to a local liquor store to purchase alcohol. Lewis was the only one of age and he went inside the store to make the purchase. The

1

four then drove to Lewis' grandmother's house in Columbia, Maryland. At some point inside the house, Lewis went to another area of the house and returned with a revolver. The four co-conspirators then left in Maready's car to meet up with Rowe. McAdoo continued to text message Rowe *en route,* lying to Rowe that she was only with Maready.

McAdoo and Rowe agreed on a meeting place. Upon arrival, ~~Pepe told~~ was told Lewis to get out and hide behind a fence. At 9:43 p.m., Lewis texted McAdoo (whose number he saved as "Amanda Pepe Gurl" in his phone a reference to the fact that McAdoo and Pepe were involved in a sexual relationship and had been for several months at this time). The message read: "Text me wen see his pulling or u rey hop the car." McAdoo then got out and slammed the door loud enough so Lewis could hear it and proceeded to Rowe's vehicle to talk to him.

At that point, Lewis approached the vehicle with his gun and fired several gunshots. Upon hearing the gunshots, Pepe and Maready drove away, leaving McAdoo and Lewis behind. McAdoo called Maready and said to meet at "her house," referring to McAdoo's grandmother's home on Park Avenue in Laurel, Maryland which was very close to where the shooting took place. The four conspirators met up again, and together the four drove north out of Howard County. Pepe told Maready to drive to a friend's house in Elkridge. According to the witnesses, Pepe was paranoid and collected everyone's cell phones. He had turned off his own phone prior to the robbery, last using it around 9:00 p.m.

At approximately 10:20 p.m., Pepe turned his phone on briefly to call a male friend who lived in a trailer park in Elkridge. The four showed up at the friend's trailer home soon thereafter. Only McAdoo and Pepe went inside the trailer. McAdoo, Pepe and the friend discussed the robbery/murder.

Still together, and still in Maready's car, the four co-conspirators left the trailer park around 11 to 11:30 pm that evening. Maready dropped Lewis, Pepe and McAdoo at Lewis' grandmother's house and then went home.

At Lewis' grandmother's house, several other men showed up and discussed the failed robbery and the shooting. Among them were Donte Powell and Avery Terry. The below photograph was posted on Instagram by Lewis at approximately 12:18 a.m. we the comment: "Me and my man pepe, turnt". (Pepe is on left; Lewis on the right).



Terry drove Pepe, Lewis, and McAdoo to Pepe's home around 3:00 a.m. The gun was also transported to Pepe's home.

The next morning, Maready joined Lewis, Pepe and McAdoo at Pepe's home on Sand Cherry Lane. The females had a pre-arranged ski trip to Pennsylvania and were preparing to leave. Pepe, Terry and others went to Maryland Live! Casino on Friday night, January 24, 2014.

Maready and McAdoo were arrested in Pennsylvania on Saturday, January 25, 2014. McAdoo texted Pepe at approximately 3:23 p.m. with the news: "Getting arrested." HCPD officers arrested Pepe outside of his home at approximately 3:15 p.m. and his cell phone was seized. No search was conducted of his home at that time. Lewis was in hiding at a local motel in Laurel.

On Sunday, January 26, 2014, at approximately 10:02 a.m., Lewis texted Terry a screen shot of Maryland Judiciary Case Search records reflecting that Pepe's arrest and the fact that he had been charged with attempted second degree murder. At the time the charges were placed, Rowe was legally brain dead but his organs were being harvested for science.

That same morning, Lewis went to Pepe's home, spoke to Pepe's mother, and went down to the basement alone to retrieve an item. At or about 2:08 p.m. on Sunday, January 26, 2014, Lewis texted Avery Terry, "Son kall me it's important now". Terry and Lewis then met up and the two partied with some females at Lewis' grandmother's house in Columbia. At or about 4:15 p.m., Surveillance units had already set up a vantage point outside Lewis' grandmother's residence on Talisman Lane in Columbia, Maryland and, approximately one hour later, saw Lewis and Terry exit the home and get into Terry's car. Law enforcement officers saw Terry attempting to shield Lewis from view as they walked outside. Inside the car, Terry began to drive away, with Lewis in the passenger seat. Officers followed the vehicle and made a traffic stop at approximately 5:45 p.m. A black .38 caliber revolver was found under the driver's seat where Terry was driving. The gun that was observed in plain view, and was further identified as a Rohm GMBH, model 38S (38 special), .38 caliber revolver, serial number FF330415. Rowe was killed with a .38 caliber revolver.

Between January 21, 2014, and January 26, 2014, call detail records and other electronic evidence seized during the course of the three investigations reflect frequent and regular telephone communications between Desmick Lewis, Taylor Pepe, Avery Terry and Donte Powell and other persons associated with all three (common contacts).

Agreed to this ⅃6 day of October, 2015.

_____
Taylor King Pepe

3